**No. 13-6214**

# United States Court of Appeals
# for the Sixth Circuit

**NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES; RIVER FIELDS, INC.**
**Plaintiffs**
and

**COALITION FOR THE ADVANCEMENT OF
REGIONAL TRANSPORTATION,**
**Plaintiff - Appellant**
v.

**FEDERAL HIGHWAY ADMINISTRATION; VICTOR M. MENDEZ**,
In his Official Capacity as Administrator of the Federal Highway Administration;
**JOSE SEPULVEDA**, In his Official Capacity as Division Administrator,
Kentucky Division, Federal Highway Administration;  **KAREN BOBO**, in her
Official Capacity as Acting Indiana Division Administrator, Federal Highway
Administration
**Defendants - Appellees**

**INDIANA DEPARTMENT OF TRANSPORTATION; MICHAEL CLINE,**
In His Official Capacity as Commissioner, Indiana Department of Transportation;
**KENTUCKY TRANSPORTATION CABINET; MICHAEL W. HANCOCK,**
In His Official Capacity as Secretary,  Kentucky Transportation Cabinet;
**KENTUCKIANS FOR PROGRESS, INC.**
**Intervening – Defendants - Appellees**

*On Appeal from the United States District Court
for the Western District of Kentucky*

# APPELLANT BRIEF OF CART

Respectfully Submitted:
s/ Clarence H. Hixson
1336 Hepburn Avenue
Louisville, KY 40204
Tel. (502)758-0936
budhix@iglou.com

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case No.:     13-6214

Case Name : **National Trust for Historic Preservation, et al.**  vs.  **Federal Highway Administration et al.**

Name of Counsel :  Clarence H. Hixson          1336 Hepburn Avenue Louisville, KY 40204

Pursuant to 6th Cir. R. 26.1, <u>THE COALITION FOR THE ADVANCEMENT OF REGIONAL TRANSPORTATION</u>
<em>Name of Party</em>
makes the following disclosure :

1.       Is said party a subsidiary or affiliate of a publicly owned corporation ?  If Yes, list below the
         Identity of the parent corporation or affiliate and the relationship between it and the named
         party:

| |
|---|
| **No** |

2.       Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in
         the outcome ? If yes, list the identity of such corporation and the nature of the financial interest: |

| |
|---|
| **No** |

---

**CERTIFICATE OF SERVICE**

I certify that on <u>September 24, 2013</u>          the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true
and correct copy in the United States mail, postage prepaid, to their address of record.

s/ <u>Clarence H. Hixson</u>

1336 HEPBURN AVENUE, # 4
LOUISVILLE, KY 40204  (502-758-0936

6CA-1
8/08

**LOCAL RULE 34(a) STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant Coalition for the Advancement of Regional Transportation (CART) respectfully request oral argument be heard in this case. This appeal is from a 59 page Memorandum Opinion and Order from District Court dismissing twenty claims of agency violations in the NEPA process leading to final approval of federal funding for two 'major projects' joined in a 'mega project,' the largest bridge -highway project ever planned in Kentucky.

The mega project's socio-environmental impacts will unreasonably induce economic growth in a wealthy, white suburban ring but leave the historically poor minority ghetto of West Louisville with inadequate mobility and in deeper poverty. Appellant's claims of error in the Court's memorandum opinion on *inter alia*, whether joining two independent major projects in a single EIS violated NEPA, whether permissive application of the "rule of reason" and deferential judicial review of agency actions improperly authorized arbitrary and capricious decisions, and must the Court use cited agency regulations adopting Title VI to measure reasonableness of FHWA decisions under NEPA rules, are difficult to fully present in a limited Brief. Oral argument will provide the Court the opportunity to fill in the gaps and explore any concerns it has regarding the contested material facts, the basis of the District Court's Opinion and the parties' positions on appeal.

# TABLE OF CONTENTS

I.    TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW. . . . . . . . .13

IV.   STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

V.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

VI.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

VII.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

       A.   Standard of Review - NEPA review through APA . . . . . . . . . . . . . 25

            1.    Standing under NEPA/APA . . . . . . . . . . . . . . . . . . . . . . . . 26

            2.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . 27

            3.    APA scope of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            4.    NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

            5.    Unregulated significant impacts . . . . . . . . . . . . . . . . . . . . . . 29

            6.    CEQ regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            7.    Deferential judicial review . . . . . . . . . . . . . . . . . . . . . . . . . 31

       B.   The District Court abused discretion by excluding NEPA evidence. 32

            1.    Plaintiff-Appellants sufficiently alleged "bad faith" action . .  34

       C.   The two-site Purpose & Need Statement was narrowly drafted
            and used to arbitrarily eliminate reasonable alternatives . . . . . . . . 36

            1.    Improperly screened out 'stand alone' alternatives . . . . . . . . 37

2.      Missing factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3.      Mega Project Claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

4.      Claims 14 & 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

5.      Title VI factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

6.      Claims 3 & 9 Reasonable alternatives analysis . . . . . . . . . . 47

D.     The SFEIS omitted significant environmental impacts . . . . . . . . . 49

1.      Suppression of Metro greenhouse gas policy . . . . . . . . . . . .49

2.      Unregulated significant impacts of Ultrafine particulate . . . . 53

3.      Chloride and conductivity . . . . . . . . . . . . . . . . . . . . . . . . .55

4.      Delay of Permitting, Tunnel Spoil disposal, Piers . . . . . . . . 57

E.     The Court erred in dismissing the Title VI Claims . . . . . . . . . . . . . 59

1.      Whether the project bears more heavily on one race . . . . . . .62
        than another

2.      Historical background of invidious purpose . . . . . . . . . . . . . 64

3.      Evidence in the decision making sequence . . . . . . . . . . . . . .66

4.      Administrative History . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

VIII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

IX.     ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

X.      CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . .74

XI.     CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74

# I.     TABLE OF AUTHORITIES

## CASE LAW

Anglers of the Au Sable,
        565 F.Supp.2d 812 (E.D.Mich. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

Ashcroft v. Iqbal,
        556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) . . . . . . . . . . 25

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,
        462 U.S. 87, 97-98, 103 S.Ct. 2246 (1983) . . . . . . . . . . . . . . . . . . . . . . 23, 30

Bell Atlantic Corp. v. Twombly,
        550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). . . . . . . . .60, 69

Bower v. Fed. Exp. Corp.,
        96 F.3d 200, 203 (6th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Buchanan v. City of Bolivar, Tenn.,
        99 F.3d 1352, 1356 (6th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

California v. Block,
        690 F.2d 753, 767 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Camp v. Pitts,
        411 U.S. 138, 142 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Celotex Corp. v. Catrett,
        477 U.S. 317, 322–24 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Cf. Madison-Hughes v. Shalala,
        80 F.3d 1121, 1124 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 63

Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,
        467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). . . . . . . . . . . . 31

Cmtys., Inc. v. Busey,
        956 F.2d 619, 623 (6th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Custer County Action Assoc. v. Garvey,
    256 F.3d 1024, 1037-1040 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 41

Friends of Tims Ford v. Tennessee Valley Authority,
    585 F.3d 955, 965 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Hazen Paper Co. v. Biggins,
    507 U.S. 604, 609, 113 S.Ct. 1701, 1705-06, (1993). . . . . . . . . . . . . . . . . 61

Kentucky Riverkeeper v. Rowlette,
    714 F.3d 402, 407 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27, 29

Kleppe v. Sierra Club,
    427 U.S. 390, 412 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 39

Ky. Waterways Alliance v. Johnson,
    540 F.3d 466, 473 (6th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27, 32

Marsh v. Or. Natural Res. Council,
    490 U.S. 360, 378, 109 S.Ct. 1851, 104 (1989) . . . . . . . . . . . . . . . . . . .30, 31

McFarland v. Jefferson County Public Schools,
    330 F.Supp. 2d 834 (W.D. Ky.2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Meister v. U.S. Dept. of Agriculture,
    623 F.3d 363, 370 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

Michigan v. United States,
    994 F.2d 1197, 1202 (6th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Motor Vehicle Mfrs. Ass'n of U.s., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29, 43, 103 S.Ct. 2856 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Nat'l Ass'n of Home Builders v. Defenders of Wildlife,
    551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) . . . . . . . . . . 28

North Carolina Alliance for Transp. Reform, Inc. v. United States Dept. of Transp.,
    713 F.Supp.2d 491, 515 (M.D.N.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . .34, 51

Ohio Valley Environmental Coalition v. Aracoma Coal Co.,
    556 F.3d 177, 201 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Reno v. Bossier Parish Sch. Bd.,
    520 U.S. 471, 489, 117 S.Ct. 1491, 137 L.Ed.2d 730 (U.S.1997) . . . . 63, 68

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332, 109 S.Ct. 1835(1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 48

Rossignol v. Voorhaar,
    316 F.3d 516, 523 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sierra Club v. Federal Highway Admin.,
    715 F.Supp.2d 721, 728-729 (S.D.Tex. 2010) . . . . . . . . . . . . . . . . . . . . . . 52

Sierra Club v. Slater,
    120 F.3d 623, 638  (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33, 34

S. W. Williamson County Ass'n. v. Slater,
    243 F.3d 270, 278 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. City of Parma, Ohio,
    661 F.2d 562, 575 (6th Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Utahns for Better Transp. v. U.S. Dep't of Transp.,
    305 F.3d 1152, 1182 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,
    429 U.S. 252, 97 S.Ct. 555  (1977) . . . . . . . . . . . . . . . . . . . . . . . 59, 62, 66, 67

# STATUTES

5 U.S.C. §§ 701 - 706  (APA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

23 U.S.C.§ 109(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

23 U.S.C. § 138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

23 U.S.C. §139(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1294(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 2000d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 61

42 U.S.C. § 2000d-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

42 U.S.C. § 4321, *et seq* (NEPA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

42 U.S.C. § 4332(2)(B)-(C) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29, 32, 49, 54, 58

49 U.S.C. § 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Kentucky State Statute**

K.R.S 175B.005 - 175B.115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# REGULATIONS

23 C.F.R. § 200.5(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

40 C.F.R. §§ 1500-1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12, 22

40 C.F.R. § 1500.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33, 42, 44, 49

40 C.F.R. § 1500.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 44, 59

40 C.F.R. § 1501.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

40 C.F.R.  § 1502.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

40 C.F.R. § 1502.2(f)-(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 44, 45

40 C.F.R. § 1502.9(a)-(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

40 C.F.R. § 1502.16  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30, 64

40 C.F.R. § 1502.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 55

40 C.F.R. § 1502.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

40 C.F.R. § 1506.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

40 C.F.R. § 1508.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 49

40 C.F.R. § 1508.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## OTHER AUTHORITIES

Section 601, Title VI of the Civil Rights Act of 1964 . . . . . . . . . . . 12,(throughout)

NEPA Section 102(2)(C) - (B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,(throughout)

Executive Order 12898 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

FHA Order  6640.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

### Rules

FRP  10(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 61

FRP  12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

FRP 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

FRP 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## II.    JURISDICTIONAL STATEMENT

This appeal concerns the failure of the Federal Highway Administration ("FHWA") and Kentucky - Indiana state Defendants-Appellees to comply with the the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*., as implemented by the Council on Environmental Quality regulations, 40 C.F.R. §§ 1500-1508.  Appellants also alleged Appellees violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(d), by denying CART's members benefits of the modified selected alternative of the Louisville-Southern Indiana Ohio River Bridges ('LSIORB') Mega-Project. The state transportation agencies are "recipients" of federal aid highway funds who waived sovereign immunity to suit for violation of Title VI. 42 U.S.C. § 2000d-7; 23 C.F.R. § 200.5(n).

Appellants challenged the 'final agency action' and pursuant to subject matter jurisdiction provided by 28 U.S.C. § 1331 this action was reviewed in Federal District Court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 - 706 *et seq*. The final Order and Memorandum of Hon. Judge John Heyburn. disposed of all CART's claims. [Final Order, ECF. Doc. 231, Pg. ID 4418-4476]. The Sixth Circuit Court of Appeals has appellate jurisdiction to review the Western District of Kentucky decision pursuant to 28 U.S.C. § 1291, 28 U.S.C. § 1294(1). Pursuant to Fed. R. App. P. 4(a)(1)(B)(ii), this appeal filed September 13, 2013, is timely within 60 days of the July 17, 2013, final order.

### III.    STATEMENT OF THE ISSUES PRESENTED

The original Claims below included some attempting to invoke citizen lawsuit jurisdiction under the Clean Air Act and Clean Water Act. Those claims are dropped in favor of NEPA claims alleging air and water issues.  Issues:

Whether the Appellees decision was arbitrary and capricious or otherwise not in accordance with NEPA law when they narrowly constructed a 'two site' Purpose & Need statement and then screened out reasonable alternatives for each site as single site stand alone options not meeting the Purpose & Need ?

Whether the Appellees violated 40 CFR 1502.2(f)-(g) when they committed resources to preferred alternative before comparison of reasonable alternatives?

Whether joining two 'major' river crossing projects, connected only by policy decisions into a single 'mega' project SFEIS, was arbitrary and capricious or otherwise not in accordance with law ?

Whether the Court abused its discretion by excluding extra-record evidence Appellants proffered to show material factors were omitted from the NEPA scoping process, alternatives evaluation, significant environmental effects analysis, and Title VI impacts decisions?

Whether, after an eight year delay Appellees decision to re-validate the same Purpose & Need statement in 2011 prior to public comment violated NEPA ?

Whether the Court improperly excused the Appellees from taking a "hard

look" at the environmental consequences of ultrafine particulates, roadway runoff of deicing chemicals to receiving waters, cumulative effects of greenhouse gas emissions and consequences of tunnel spoil hauling and placement?

Whether NEPA's Section 102(2)(B) and (C) mandated a "hard look" at the significant environmental effects of human exposure to non-regulated ultrafine particulates?

Whether the Appellees decision was arbitrary and capricious or otherwise not in accordance with NEPA law when they excluded social justice factors from the P & N and alternatives comparison after a Title VI Complaint was filed ?

Whether Appellants met the prima facie burden to go forward to show Appellees intentionally discriminated on the basis of race in violation of Title VI in the approving the modified selected alternative of the LSIORBP ?

### IV.    STATEMENT OF THE CASE

This is an appeal from the July 17, 2013, final order of Judge John G. Heyburn, II, dismissing all claims alleged in Appellant's Amended Complaint. [Complaint R.E. Doc. 124, Pg Id # 1129-1142], [Final Order R.E. Doc. 231, Pg Id # 4423 - 4429].  CART is a 501(c)(3) tax exempt non-profit citizen group dedicated to pursuing a rational plan for sustainable and socially just public transit in the project region.  CART's Complaint was filed September 4, 2012 in Federal

District Court and cross motions for Summary Dismissal were filed in January-February 2013. CART moved for a de novo trial on the Title VI claims of intentional race discrimination on January 7, 2013. [R.E. Motion Trial Doc 179; Title VI Memorandum, R.E. Doc179-1 Pg ID #: 3228-3246].

The final agency decision appealed pursuant to the APA was the Revised Record of Decision ("RROD"), published in Federal Register Volume 77, Number 126 (Friday, June 29, 2012). 5 U.S.C. § 704.  The Complaint below was timely filed within applicable statute of limitations pursuant to 23 U.S.C. §139(l).

The NEPA process occurred in two segments spanning fourteen years and created a large, three volume administrative record. [AR1- 20,269 pages; AR2- 127,210 pages; AR3- 9,959 pages]. The first NEPA process occurred from the March 27, 1998, Notice of Intent, to September 2003, when the FEIS and ROD were issued. [2003 ROD, R.E. AR1_00007553]. Appellees relied on and revalidated findings from the 2003 NEPA documents in the later process.

In the eight years between 2003 and 2011, Appellees worked in state legislatures to assemble the statutory basis for a bi-state authority to finance and administer the mega project revenue collection through a tolling authority.

In June 2009 the Kentucky legislature created the statewide Kentucky Public Transportation Infrastructure Authority, which voted in October 2009 to recommend that KY Governor Beshear, in cooperation with IN Governor Daniels,

create a bi-state authority for the Ohio River bridges project.  KRS 175B.005 -
175B.115.

In September 2009, pursuant to the six-year statute of limitations in 28
U.S.C. § 2401(a) then in effect, Plaintiffs, National Trust for Historic Preservation
and Riverfields, Inc. filed suit under NEPA, ("Section 4(f)"), 23 U.S.C. § 138, 49
U.S.C. § 303 and APA, principally challenging the project impacts on historic
properties. The bi-state Bridges Authority held its first meeting February 2, 2010.
Its appointed officers were major economic figures in banking, shipping and
manufacturing from both states. On February 15, 2011, Appellees published a
Notice of Intent (NOI) to prepare an SEIS pursuant to 40 CFR 1502.9(c)(1)(i).

After the June 29, 2012 RROD was issued, CART entered the litigation. On
January 8, 2013, the first Plaintiffs made a separate settlement of which CART had
no part, and withdrew. [Order dismissing, R.E. Doc 180, Pg Id # 3284]. CART
continued as sole Plaintiff through the final order of Judge Heyburn in July 2013.

## V.    STATEMENT OF FACTS

CART has been involved in the LSIORBP process before 1999, and
complaining consistently, that project proponents were ignoring relevant facts and
executing a pre-conceived outcome:

"The materials and topics we have been presented with to date are definitely
biased toward highway expansion alternatives without considering these

other issues. Even the "Alternatives Workshop" in October focused on highway based solutions and demonstrated that the consultant has done no work to evaluate transit alternatives . . . Intentional or not, the current structure has co-opted the process and pre-determines the results.

1999 CART letter [AR2 00125111];[SJ Response Doc. 213, Pg ID# 3994].

When a comprehensive Supplemental Final EIS was noticed and the 2012 RROD filed, CART filed its original Complaint. The Complaint below set forth a Statement of Facts relevant to the claims which is incorporated here by reference. [Complaint Doc. # 124, Pg ID # 1129-1142]

The purpose and need for the challenged project originated from the Louisville Metropolitan Planning Organization - KIPDA and principally responded to a desire to create a cross river linkage from east Jefferson County to southern Clark County, to provide a freight route and reduce vehicle miles traveled through the Downtown bridges.  See, November 1996 [JHK ORMIS Study, R.E. AR2_00125686](recommending two bridge solution); August 1999 [CTS Scoping Study, R.E. AR2_00123696]("if the Indiana Ammunition Plant is to be developed, transportation access must be improved.").  Transportation induced economic growth in the east county area was the first and principal focus driving the MPO ORMIS process. At the same time, reducing Downtown congestion at the three interstate junction was a second focus of Appellees planning.

In February 1998, KIPDA amended the metropolitan area's long-range transportation plan to include two new Ohio River bridges and the reconstruction

of the Kennedy Interchange in downtown Louisville. [KYTC-INDOT E-J Letter to

FHWA, AR2_102561].  In December 1998, the two state transportation

departments, KYTC and INDOT, entered into a formal contract, signed by the two

states Governors. The contract described a preferred 'two bridges and Spaghetti

Junction rebuild' alternative and apportioned design responsibility for east end and

downtown bridge approaches and main spans among the two states and committed

$ 2 million in funds for project. Section 1, Scope of the Work, included that a

Downtown and an East end bridge would be built. [Agreement AR2_00125598 -

00125602].  The two states did not identify a preferred alternative in the DEIS but

the two bridges plan was already committed to by local officials and money was

invested before undertaking the NEPA public consultation process. 40 CFR

1502.2(f)-(g).  To implement the contract, Appellees developed a regional 'two site'

Purpose & Need Statement.

    From 1996 to 2002, Transit Authority of River City ('TARC')  developed a

light rail plan for the Metro I-65 corridor, dubbed  Transportation Tomorrow,

('T2'). Its planning team held 282 community meetings, 132 meetings with public

agencies, and 162 interviews with key leaders and stakeholders to select a light rail

first route for the city passing through a low income minority area, Smoketown.

     In the same month as the governors signing of the KYTC-INDOT contract,

the FTA in emails to KIPDA said it was unreasonable that the T2 light rail project

18

being prepared for an EIS would be federally funded and therefore the project must be removed from the KIPDA CAA Conformity submission. [FTA emails, AR2_00124475; AR2_00124426].  See [Complaint, R.E. Doc. 124,  ¶¶ 43 - 48, Pg Id #  1129- 1131].

At the behest of CART, project contractor CTS considered a potential light rail system. The routes considered included a new dedicated light rail bridge and extensive feeder bus system. [DEIS Alternatives,  AR1_00012474]. After finding the three line light rail system would reduce VMT and VHD, remove 1600 cross river trips per day and cost $ 948 million, the LRT alternative was rejected, because, *inter alia*, it would not address "the continuity of the circumferential freeway system," in the East End and thus not meet the P & N. [DEIS Alternatives, AR1_00012490].  The 'two site' purpose & need statement was used to screen out low emissions, energy efficient light rail by comparing it as a one site 'stand alone' alternative for polluted Downtown Metro Louisville.

After the eight year delay between 2003 and 2011 Notice to develop a Supplemental EIS, Appellees were even more deeply committed, both legally and financially, to the original 1999 two bridges mega project. On Feb 24, 2011, and before any public consultation, the agencies circulated a policy paper, marked 'privileged and confidential titled, Approach to Preparation of SEIS,  [R.E. AR2 00051756 - AR2 00051757]. The paper documents the Appellees decision that

there was no need to change the P&N, "the elements would remain the same, but the supporting data would be more current."

Between 2009-2010, and prior to the circulation of the Purpose & Need for re-validation the state legislatures were assembling the financial entities to toll bridges. Predictably, on June 3, 2011, FHWA revalidated the 2003 P&N in the Purpose and Need White Paper [P&N White Paper, R.E. AR1_00001071-1079]. The subsequent October 2011, Supplemental Environmental Impact Statement Alternatives Evaluation Document re-comparison of alternatives, again screened out the light rail transit alternative on the same basis and without further study of environmental factors or ridership based on the 2003 alternatives matrix. [2012 Alternatives, R.E. AR1_00001112](Mass transit dismissed as stand alone option.). [DEIS Alternatives, AR1_0012474; AR1_0012489] (finding three route ridership removes less than 1% of total 'two site' cross river vehicle traffic projected in 2025).

From 1998 to 2011, the social, environmental and economic context of the project area changed substantially. Appellees own traffic counts show bridge traffic declined since 2007 due to gasoline price increases and changing driving habits. [CDM Smith Traffic Forecasts R.E. AR1_00004571]. From 2005 onward, reducing greenhouse gas emissions from the transportation sector emerged in Metro Louisville as a significant policy objective. In April 2005, Louisville's

Mayor Jerry Abramson signed the U.S. Mayors Climate Protection Agreement, a voluntary pledge to reduce greenhouse gas (GHG) emissions. [R.E. Trinity Inventory, Doc 227-1 Pg Id # 4238].   In November 2008, Trinity engineering consultants delivered to Metro Louisville a Greenhouse Gas Inventory finding, "total GHG emissions per capita within the Louisville Metro area are among the highest in the nation for large municipalities." [Inventory, Doc 227-1 Pg Id # 4244]. "Without any emissions mitigation measures, it is anticipated that the community will contribute 19,553,954 and 20,233,123 tons of CO2e, in 2012 and 2020, respectively."   The inventory contained a comprehensive GHG analysis.

Defendants do not dispute the air quality of the Project area has degraded since 2003. There have been 24 violations of the 8-hour ozone NAAQS standard in summer 2012. The Metro MPA is deemed in non-attainment status for the annual average PM 2.5 standard, in maintenance status for the 8-hour ozone standard, and was ruled recently to be in non-attainment of sulphur dioxides, SO2. [R.E. RROD AR1_0000019, Section 4.4, pg 4-145].

Respiratory illness including asthma is at epidemic proportions in Louisville in 2012 with 18,239 juvenile cases and 59,161 adult cases in Jefferson County as reported by the American Lung Association.   The peer reviewed publication of the Metro Louisville Department of Public Health and Wellness Center, Louisville Metro Health Equity Report: The Social Determinants of Health in Louisville

Neighborhoods, points to 'structural racism' as a continuing cause of respiratory health disparity along with other disparate disease rates affecting the Title VI population and leading to shorter lives for low income minorities. [Health Equity, R.E. Doc. 124-6, Pg Id #  1173] [Complaint, R.E. Doc. 124,  ¶ 63, Pg Id #  1137; ¶ 72, Pg ID# 1141].

## VI.    SUMMARY OF THE ARGUMENT

The Appellees SFEIS was inadequate and the decisions in scoping, comparing alternatives and approving the modified selected alternative in the LSIORBP were arbitrary and capricious or otherwise not in compliance with the law, and the District Court improperly dismissed CART's twenty claims. The project purposefully discriminated on the basis of race against the Title VI population in West Louisville by failing to integrate Title VI factors denying them the benefits of induced economic growth while burdening them with race disparate tolling and enforcement for at least 46 years.

The Court sits as the finder of fact in review of the agencies compliance with NEPA and CEQ rules. In determining whether the agencies have sufficiently complied with the law in scoping the project and preparing an EIS the Court may not excuse the agencies from meeting the standards set by Congress in 42 U.S.C. §§ 4223(2)(B) and (C) as implemented by 40 C.F.R. §§ 1500-1508.  The Court must determine by sufficient independent review of the record and proffered extra

record materials, if an environmental effect is significant, and if it has been appropriately addressed in the EIS. Congress in NEPA mandated impacts or effects of the project must be given a "hard look' in the EIS regardless of whether national standards or limits have been promulgated to regulate them.

CARTs claims the agencies failed to investigate sufficiently particular impacts is not a disagreement about the technical method used to detect and quantify the impacts, but in this case is an objection to their failure to determine significance and disclose effects by any method. An agency decision to exclude analysis of specific significant impacts of the selected alternative, and failure to use the impacts in the comparison of alternatives, violates NEPA and the CEQ regulations and is arbitrary and capricious and not a matter of agency expertise in methodology entitled to deferential judicial review.

The Court is well within its authority to require inclusion and use of significant environmental impacts and find as a matter of fact they are significant. Kentucky Riverkeeper, Inc. v. Rowlette, 714 F.3d 402, 411 (6th Cir. 2013)( citing, Balt. Gas & Elec. Co., 462 U.S. 87, 97-98, 103 S.Ct. 2246 (1983).

The Court may not rely upon the 'rule of reasonableness' where the agency ignores and fails to report significant impacts. Thus, in the first instance the Court must satisfy itself whether the agency has determined if an impact is significant and if that determination is reasonable. In this case, the Court abused its discretion

23

by excusing the Appellees from determining whether impacts were actually
significant and from meeting the factors for a 'hard look'.   Where the agencies
determined such impacts were insignificant or 'uninformative' to the comparison of
alternatives, CART alleged the decision was a matter of disputed material fact and
therefore inappropriate for summary dismissal.

High concentrations of ultrafine combustion particulates caused by the
selected highway alternative, cumulative impacts of combustion greenhouse gas
emissions, acute and chronic uncontrolled water pollution impacts to ecosystems
caused by deicing chemicals running off new highways and bridges, and impacts
of hauling, excavation and fill placement of 350,000 tons of tunnels spoil were not
given a "hard look" in the SFEIS, making it unreasonable and insufficient.

CART further argues it has standing to claim Title VI violations on behalf of
its low income minority members and in its organizational interests,

> *"CART promotes environmentally sustainable, socially just, multi-modal
> transportation that provides affordable access and regional connections to
> all race and income groups."*

The scoping process for the LSIORBP, beginning in 1997 and reapproved in 2011,
purposefully discriminated against the Title VI population.  Substantial
circumstantial evidence supports the claim the Appellees were motivated by race
discriminatory animus that has a long history in the community.

By drafting a Purpose and Need statement that required projects at two sites

to meet its factors and then considering unfavored alternatives, such as light rail, as stand alone options, the Appellees unfairly eliminated alternatives that would have benefitted low income minorities dependent on public transit.

The District Court also abused discretion and substantially prejudiced CART when it excluded extra-record evidence proffered to support its burden to survive summary dismissal under the Claims. Finally, the District Court committed error when it failed to read the Claims in the Complaint together with the facts alleged and other materials proffered by Appellants in supporting their burden of stating a prima facie case to survive summary dismissal in their Title VI claims.

## VII.   ARGUMENT

### A.    Standard of Review - NEPA review through APA

A district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction is reviewed de novo. Madison-Hughes v. Shalala, 80 F.3d 1121, 1123 (6th Cir. 1996). The Court of Appeals will review de novo the district court's determination that the complaint is legally insufficient. Southwest Williamson County Community Ass'n, Inc. v. Slater, 173 F.3d 1033, 1038 (6th Cir. 1999). When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Bower v. Fed. Exp. Corp., 96 F.3d 200, 203 (6th Cir.1996); Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009). " To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to '
state a claim to relief that is plausible on its face.'" Id. This plausibility standard "
is not akin to a 'probability requirement,' but it asks for more than a sheer
possibility that a defendant has acted unlawfully.

Pursuant to FRP 10(c), a party may adopt by reference a statement made in
one pleading in any other. CART incorporated into each of its claims in the
Complaint and Amendments, the preceding factual and legal averments.

The Court of Appeals will review a district court's decision to convert a
motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under
Rule 56 for abuse of discretion. Once the conversion has been made, the substance
of the district court's decision is reviewed de novo. Friends of Tims Ford v.
Tennessee Valley Authority, 585 F.3d 955, 965 (6th Cir. 2009).

### 1.    Standing under NEPA/APA

Whether a party has standing to assert "NEPA claims" [. . .]  is an issue of
law subject to de novo review." Friends of Tims Ford, 585 F.3d at 966, (citing,
Michigan v. United States, 994 F.2d 1197, 1202 (6th Cir.1993)). CART meets
organizational standing when: (1) at least one of the organization's " members
would otherwise have standing to sue in their own right"; (2) " the interests it seeks
to protect are germane to the organization's purpose" ; and (3) " neither the claim
asserted nor the relief requested requires the participation of individual members in

the lawsuit." <u>Friends of Tims Ford</u>, 585 F.3d at 967.  [CARTs SJ Response, NEPA

standing, Doc. 218, Pg. Id.# 4098-4102].

"In a NEPA suit, a cognizable procedural injury exists when a plaintiff

alleges that a proper EIS has not been prepared ... when the plaintiff also alleges a '

concrete' interest-such as an aesthetic or recreational interest-that is threatened by

the proposed actions." <u>Id.</u> at 968.  CART argued standing in its pleadings below.

See, [Complaint R.E. Doc. 124, Pg Id # 1118-1119], [Affidavits, Docs. 154-1,

David Coyte,  154-2 Terrell Holder; Mattie Jones Doc. 214-1].

### 2.    Summary Judgment standard

The Sixth Circuit reviews the district court's summary judgment rulings de

novo and the FHWA'a decisions approving the SFEIS and RROD under the APA's

arbitrary and capricious standard. <u>Kentucky Riverkeeper v. Rowlette</u>, 714 F.3d at

407(citing, <u>Ky. Waterways Alliance v. Johnson</u>, 540 F.3d 466, 473 (6th Cir.2008)).

Summary judgment is proper if the record shows that no genuine dispute exists as

to any material fact, and the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(a).  Federal Rule of Civil Procedure 56(c) provides that a court

shall grant summary judgment, "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v.</u>

Catrett, 477 U.S. 317, 322–24 (1986). If both parties have moved for summary judgment, a court should consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

### 3.    APA scope of review

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA an agency's decision is arbitrary and capricious when the agency has: "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007). The Circuit Court does not defer to the District Court's decision, but instead reviews the administrative decision as if it was the first reviewing court. Meister v. U.S. Dept. of Agriculture, 623 F.3d 363, 370 (6th Cir. 2010).

### 4.    NEPA

NEPA merely prohibits uninformed-rather than unwise-agency action."
Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835,
1846, 104 L.Ed.2d 351 (1989).  Section 102 of the National Environmental Policy
Act of 1969, sets out procedural mandates for investigation and reporting of
environmental impacts of federally funded major projects. 42 U.S.C. 4332(2)(B)
and (C).  "NEPA employs a " set of ' action-forcing' procedures that require
agencies to take a ' hard look at environmental consequences." Kentucky
Riverkeeper, Inc. v. Rowlette, 714 F.3d at 407.  The purpose of NEPA is twofold:
" 'ensure[ ] that the agency ... will have available, and will carefully consider,
detailed information concerning significant environmental impacts[, and]
guarantee [ ] that the relevant information will be made available to the larger
[public] audience.' Robertson, 490 U.S. at  349; see also 40 C.F.R. § 1500.1(b)
(environmental information must be provided "before decisions are made and
before actions are taken." ).

### 5.    Unregulated significant impacts

Neither, NEPA nor CEQ regulations limit the required "full and fair
discussion of significant environmental impacts" in the EIS, to only those
significant impacts that are presently regulated by promulgated standards or limits.
42 U.S.C. § 4332(2)(B) provides: (2) "all agencies of the Federal Government

shall— (B) identify and develop methods and procedures, . . . [to] insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." The CEQ regulations are consistent and require the agency to produce information about unregulated "reasonably foreseeable significant adverse impacts" including potential catastrophic impacts even of low probability of occurrence. 40 C.F.R. § 1502.22. 40 C.F.R. § 1502.16 (discussion of direct and indirect effects in the EIS); 40 C.F.R. § 1502.1("discussion of significant environmental impacts"); 40 C.F.R. § 1508.8 "Effects" defined ("direct and indirect effects; impacts and effects synonymous").

NEPA and the Council on Environmental Quality (CEQ) implementing regulations provide the scope of factors and procedures for measuring whether the agency decisions fails the APA review standard.   "Judicial review of NEPA compliance is limited in scope." Cmtys., Inc. v. Busey, 956 F.2d 619, 623 (6th Cir.1992). Courts "ensure that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious." Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, 462 U.S. at 97-98.

"Courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the

evidence. <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

### 6.    CEQ regulations

In reviewing challenges to NEPA compliance, the Court shall give, "substantial deference" to the regulations promulgated by the Council on Environmental Quality (CEQ), the federal agency established to fill in the gaps of NEPA's regulatory scheme. <u>Marsh</u>, 490 U.S. at 372.  40 C.F.R. § 1500.3 Mandate.

### 7.    Deferential judicial review

The Court has the authority to construe NEPA law and should defer to the CEQ interpretation of the implementing regulations.

> "[T]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. [ ] If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."

<u>Chevron USA, Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). When an issue involves competing analysis of technical, scientific facts that a Court concludes require a high level of technical expertise, the Court must defer to "the informed discretion of the responsible federal agencies." <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976). The Court must first look to see if "informed discretion" was actually exercised. The reviewing court " may not supply a reasoned basis for the agency's action that

the agency itself has not given." <u>Ky. Waterways Alliance v. Johnson</u>, 540 F.3d at 474. "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes "a 'rational connection between the facts found and the choice made." <u>Motor Vehicle Mfrs. Ass'n of U.s., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43, 103 S.Ct. 2856 (1983). "The procedural duty imposed upon agencies by this section [102] is quite precise, and the role of the courts in enforcing that duty is similarly precise." <u>Kleppe v. Sierra Club</u>, 427 U.S. at 412 (construing, 42 U.S.C. § 4332(2)(C)).

An agency decision must be ruled arbitrary and capricious if it entirely fails to analyze impacts against the factors in CEQ rules. For example, CEQ regulations direct federal agencies to determine the "significance" of a project's environmental impact by considering "both context and intensity." 40 C.F.R. § 1508.27.

Assessment of an impact's intensity requires consideration of ten factors, including, inter alia, (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b). [Reply to KY-IN Doc. 213, Pg. ID # 4000- 4001](Citing, <u>Anglers of the Au Sable v. U.S. Forest Service</u>, 565 F.Supp.2d 812, 825(E.D. Mich 2008).

**B.      The District Court abused its discretion by excluding NEPA evidence**

In a NEPA challenge to the sufficiency of an EIS, the reviewing Court must

consider extra-record evidence since the underlying claim is that the agency failed to consider or include relevant and material facts. "Without consideration of CART's extra-record evidence the Court will not be able to evaluate the claims." [CART Reply, Doc. 219, Pg. ID# 4125]. Exclusion of extra record evidence prejudiced CART in multiple claims.

In this case, the District Court imposed an outdated, pre-NEPA legal standard, requiring CART to meet a burden to make a 'strong showing' the agencies acted in bad faith. [Final Order, Doc. 231, Pg. Id # 4432] (citing, Sierra Club v. Slater, 120 F.3d 623, 638  (6th Cir. 1997). The narrow rule actually comes from the older, non-NEPA case of Camp v. Pitts, 411 U.S. 138  (1973). That case is distinguished as non-NEPA. It does not construe the purposes of expanding the record to show an agency omitted analysis from an EIS.

"[A] NEPA suit is inherently a challenge to the adequacy of the administrative record . . . That is why, in the NEPA context, " courts generally have been willing to look outside the record when assessing the adequacy of an EIS or a determination that no EIS is necessary. Ohio Valley Environmental Coalition v. Aracoma Coal Co., 556 F.3d 177, 201 (4th Cir. 2009).  NEPA Section 102, and the CEQ regulations contain substantive requirements for the inclusion of high quality scientific information in the EIS. 40 C.F.R. § 1500.1.  Where NEPA action-forcing rules apply, the record should be expanded.

"Although the review is confined to the administrative record, the Court may consult documents outside the record, such as the declarations submitted by the plaintiffs, to determine if there is any information the agency should have considered but did not."

Anglers of the Au Sable, 565 F.Supp at 822.

Sierra Club v.Slater approved the admission of extra record evidence by the Court below and did not apply a "strong showing of bad faith" standard. The Court merely looked in vain for, "a single factor that would suggest the administrative record was inadequate for an assessment of their claims." 120 F.3d at 639.

"Several reasons justify supplementation of the administrative record, such as when an agency deliberately or negligently excludes certain documents, or when the court needs certain " 'background information' in order to determine whether the agency considered all of the relevant factors."

Id. See also, North Carolina Alliance for Transp. Reform, Inc. v. United States Dept. of Transp., 713 F.Supp.2d 491, 515 (M.D.N.C. 2010). Exclusion of extra-record evidence submitted to show an agency did not consider an important part of the problem is the established rule and its exclusion prejudiced CART and is reviewed for abuse of discretion. Sierra Club v. Slater,120 F. 3d at 639.

## 1.    Plaintiff's sufficiently alleged and supported "bad faith" action

While making a strong showing of 'bad faith' is not the sole factor justifying expansion of the administrative record, CART did make such a showing. "The term "bad faith" implies actual or constructive fraud, a design to mislead or deceive, and the refusal to fulfill some contractual duty." [R.E. Doc. 209, Pg ID#

3924](Citing Black's Law Dictionary definition). CART alleges the Appellees

made false statements in the SFEIS.  "FHWA ignored and evaded review of

significant environmental impacts in order to justify the two bridges plan decided

prior to the ORMIS process." [Reply R.E. Doc. 219, Pg ID # 4129];

> CART does allege the record is incomplete in critical areas related to traffic modeling, evaluation of alternatives, elimination of the T2 light rail project, formulation of the Purpose and Need statement, conditions of socio economic status of the Title VI portion of the KIPDA region, current condition of impacted waters, green house gas impacts and other significant areas. Without consideration of CART's extra-record evidence the Court will not be able to evaluate the claims.

> "[T]he Defendants have attached about 3,447 pages of "extra-record" evidence beginning at AR2–00006141 that is dated from 7-31-12 to 9-10-12. [post RROD]

[Reply, 4124]. CART attached more than 41 proffered exhibits to its pleadings,

motions and responses.  As argued in the relevant sections *infra*, CART argued the

Appellees acted in bad faith when they constructed a two site P&N Statement and

used it to eliminate reasonable alternatives for each separate site; when they knew

of and purposely excluded greenhouse gas emissions data of the LSIORBP despite

a Metro policy and EPA recommendation to include it; when they pre-selected the

A-15 route for the East End bridge in 2000 and committed to it before the

revalidation of the alternatives in 2011[Resp. S.J. Doc. 213, Pg ID # 4015-4016];

when they circulated a strategy showing the predetermination to re-validate the

Purpose & Need prior to NEPA public consultation; when they excluded social

justice factors from the scoping process despite FHWA Orders to integrate Title VI

impacts into the early planning; when they delayed water quality analysis of

deicing chloride impacts to receiving waters outside the EIS.

CART argued its proffered exhibits were relevant and material to the Title

VI claims: [Title VI Reply, R.E. Doc 230, pg ID # 4394, 4400]. CART also argued

bad faith and supported the argument with extra-record exhibits in relation to the

Title VI claims. When CART alleged 'bad faith' action the Court dismissed the

contentions outright and refused to consider proffered extra-record evidence. [Final

Order, Doc. 231, Claim 7, Pg. Id. # 4443].


**C.    The two-site Purpose & Need Statement was narrowly drafted and used by Appellees to arbitrarily eliminate reasonable alternatives**

CART claimed the Purpose & Need was narrowly drawn in violation of

NEPA and purposely used to eliminate competing alternatives to the ORMIS two

bridges plan.  [Complaint Doc. 124, Statement of Facts, ¶¶ 43 - 50, Pg. ID # 1129-

1132,  Claim 15, ¶ 132 (a), Pg ID# 1153].

CART complained the revalidation of the 2003 Purpose & Need was a

"sham process" and the decision was made before February 2011and prior to

public consultation. [Complaint Doc. 124, Claim 7,  ¶¶ 99-100, Pg ID# 1147];[2nd

Amended Complaint Doc. 228, Claim 20, ¶ 61-167, Pg ID# 4368- 4369].

CART complained the first and revalidated Purpose & Need excluded Title

VI social justice factors favoring low cost mass transit and low emissions and energy efficiency factors, both unreasonably in violation of NEPA and in purposeful discrimination against the poor minorities of the West End Title VI area. [Complaint Doc. 124, Claim 3, ¶¶ 82-86, Pg ID# 1144-1145Claim 9, ¶ 108, Pg ID# 1148; Claim 12, ¶ 123, Pg ID # 1151; Claim 14, ¶¶ 128-130, Pg. ID # 1152-1153;  Claim 15, ¶¶ 131- 133].

Procedurally, a valid Purpose & Need dictates the reasonable choice of alternatives. Here, Appellees deliberately joined two distantly located actions without direct connection or impacts to assure the selection of a large tolled project. The two actions addressed different factors. Downtown bridge congestion and safety factors were particular to that site and unaffected by actions at the other site. Cross river linkage was a need particular to the east end site. To meet the purpose & need combining both site factors, only a two site option would pass screening. Thus the East End Bridge only alternative was excluded because it would not reduce traffic safety concerns on the Kennedy Bridge. The irrational comparison caused rejection of reasonable alternatives specific to the particular site. The inclusion of two sites multiplied the complexity of the EIS defeating the ability of the public to follow or comprehend the mixed messages.

## 1. Screened out 'stand alone' alternatives

Reasonable single site alternatives of building an East End Bridge first,

combined with low emissions light rail alternatives for the polluted Downtown, were screened out in the first round because each was evaluated as a stand alone alternative against the two site Purpose & Need. Light rail would not address the desired cross river linkage in the East Jefferson County and a single East End Bridge would not address Downtown bridge congestion and traffic safety sufficiently.  Only the two bridges and Spaghetti Junction rebuild ORMIS project was considered as a two site option and carried forward. The P&N and resulting comparison was 'programmed' to produce the desired outcome.  "After studying these alternatives in detail, the FEIS concluded that only the Two Bridges/ Highway Alternatives met the purpose and need of the project." [SFEIS Alternatives, AR1_00001092]  "[Mass Transit] would not improve the geometrics of the Kennedy Interchange and Kennedy Bridge . . . and would not provide a cross-river connection in the east end to provide the needed system linkage." [AR1_00001108]. See Table 2 [AR1_00001112](dismissing Mass Transit as a stand alone option.

### 2. Missing factors

The Alternatives Document contains a section discussing 'Updated information utilized for the comparison.' [AR1_00001113]. <u>Nothing</u> in that section discusses updated socio-economic impacts in the West End Title VI area, or greenhouse gas climate change policy, or deicing pollution, but it does include the

designation of the Wellhead protection area. The Purpose & Need White Paper purports to comply with CEQ SEIS regulations, including - "substantial changes in the proposed action that are relevant to environmental concerns," 40 CFR 1502.9 (c)(1)(i).  Its also missing any updated factors addressing Title VI or air pollution/climate change. [SFEIS AR1_00000306]. The revalidation of the P & N formally reconsiders only steady increasing traffic, accident rates and east end linkage but not other Title VI or air pollution factors such as identifying the need to address NAAQS particulate non-attainment or climate change gas emissions. No real review of changed circumstances was included in the revalidation analysis despite the significance of these impacts after the eight year delay.

### 3.    Mega Project Claim 1

The Court disposed of CART's Claim 1, that the 'two site' Purpose & Need statement was improper, finding the agency decision that two geographically distant sites were "connected" under 40 CFR 1508.25(a),  a reasonable and proper conclusion. CART argued the Claims 1 and 14 below.  [Reply to KY-IN Doc. 213, Pg. ID # 4010- 4015]. The District Court ruled the agency decision to join the two site projects under a 'regional' purpose & need statement adopted from the ORMIS process, was a decision best left to the informed discretion of the 'responsible federal agencies.' Kleppe v. Sierra Club,  427 U.S. at 412. [Final Order, R.E. Doc. 231, Pg. ID# 4435].

The origin of the Purpose & Need is a matter of record and came from KIPDA. See, August 1999, Scoping Document for the LSIORBP [CTS Scoping Doc.AR2_00123691-AR2_00123707]. "The first step would be to construct a new bridge crossing on the east side of Louisville extending from Gene Snyder Freeway . . . or Watterson Expressway to the present Indiana 265 terminus . . ." [Id. AR2_00123697]. In the early scoping documents there is no indication that two actions had to be joined or that one could not proceed first without the other. The initial concept as evidenced in the "CTS Scoping Document" was for a stepwise, phased process.

CART argued below the project history demonstrates the transportation agencies were deprived of discretion to do anything other than propose a single EIS for the LSIORBP. The contract [AR2–00125598] signed by the two states Governors represented a controlling action agenda not subject to change as a result of environmental impacts. [CART S.J. KY-IN Doc. 213, Pg. ID # 4010].

The ORMIS consultants, JHK & Associates, recommended the 'two bridges' project in November 1996 and identified tolling as a source of substantial revenue. [AR2_00125690]; [JHK Opinion AR2_00125684-AR2_00125691]. The JHK opinion doesn't indicate anywhere that one bridges 'triggers' another, only that two cross river sites addressed separate needs. "East end bridge alone will not solve the problems with Spaghetti Junction." [AR2_00125687]. The KIPDA MPO

Transportation Policy Committee adopted the ORMIS two bridge project recommended by JHK on December 19, 1996.

One year later, KYTC and INDOT memorialized their commitment to a 'two bridges' project. [Financial Plan, AR2_00125603]("The Kentucky Transportation Cabinet and Indiana Department of Transportation *are committed* to the construction of two bridges in the Louisville-Southern Indiana area as identified in the Ohio River Major Investment Study (ORMIS) and unanimously adopted by the KIPDA Transportation Policy Committee on December 19, 1996.")(emphasis added). Id.

The record shows the CEQ regulations were not consulted and the decision to join two projects in a single action was political not scientific expertise. "Informed agency experts" did not say one bridge would not occur without the other or discuss 'automatic triggering' 40 C.F.R. § 1508.25 (a)(1)(i) caused by the impacts of one on another. Either site project could have been built alone. "Projects that have "independent utility" are not "connected actions" under 40 C.F.R. §1508.25(a)(1)(iii). Custer County Action Assoc. v. Garvey, 256 F.3d 1024, 1037-1040 (10th Cir. 2001).

It is noteworthy that the referenced scoping documents contain not a word of discussion about serving depressed Title VI populations. These factors were clearly not considered. Instead there are paragraphs discussing the purpose to reduce

congestion Downtown and serve the development of the Indiana Army

Ammunition Plant under development in Southern Clark County. [CTS Scoping,

AR2_00123696]. For two years before the first Notice of Intent was published on

March 27, 1998,  the Appellees and the MPO were committed financially and

contractually to the same project being built today. [Notice, AR2_00125521].

The decision to join two 'major project' actions into a mega project and into

a combined EIS had significant adverse NEPA procedural and socio-economic

consequences. The eight year delay caused by the need to change laws to allow

tolled financing of the mega project substantially increased the cost of both

projects and was not a decision in the best interest of the community. 23 U.S.C. §

109(h). CART argued the reason for the decision in addition to a giveaway to the

financing institutions was the desire to stop the light rail project T2, then under

development. [Complaint Doc. 124, ¶ 77, Pg ID# 1143].

The CEQ scoping regulations at 40 C.F.R. § 1501.7(a)(2) address the proper

contents of an EIS. By abandoning the stepwise plan of an East End Bridge built

first, the scope of unrelated environmental issues in the EIS doubled in complexity.

"NEPA's purpose is not to generate paperwork, even excellent paperwork–but to

foster excellent action." Environmental information was to have been available

before decisions were made. 40 C.F.R. § 1500.1(b). But here, the project selection

decisions preceded the NEPA process by two years and deprived the agency

experts of the discretion to fairly compare alternatives.  For the foregoing reasons, the Court's ruling dismissing Claim 1 finding the decision was the product of informed experts and was reasonable, is clear error.

### 4.    CART's Claims 14 & 20

CART complained in Claim 14 first, that the Purpose & Need was not in the best public interest and unreasonably excluded significant affirmative action factors as 'needs' considering the project context of chronic abject poverty and joblessness in the Title VI area, the West End. CART incorporated by reference its statement of facts. [Complaint Doc. 124, ¶¶ 43 - 48, Pg ID# 1129-1145; 1148]. CART supported this argument with proffered exhibits.

CART complained the same factors were again excluded in the 2011 revalidation of the Purpose & Need. [Complaint R.E. Doc. 124, ¶¶ 128-130, Pg. ID# 1152-1153].

In Claim 20 (numbered Nineteen in the document), on the basis of a risk avoidance memo, "Approach to Preparation of the SEIS" [AR2_00051756-AR2_00051757], CART alleged the Appellees put the original 2003 FEIS P&N up for public comment in bad faith on June 3, 2011, having already decided not to change it earlier in February.  The 're-evaluation and updating' was a sham process. As a second part, CART claimed revalidating the P&N was arbitrary and capricious without considering the changed conditions over ten years with regard

to greenhouse gas emissions and air pollution. [2d Amended Complaint, Doc. 228, Pg. ID # 4368-4369].

The Court dismissed all of Claims 14 and 20 finding the agencies fulfilled their responsibilities by putting the P&N out for comment in June 2011 and did not act arbitrarily or capriciously. The Court discussed its findings regarding the history of the 2003 P&N in the final Order [R.E. Doc. 231, Pg ID# 4420- 4425]. The Court discussed the revalidation of the P&N, [R.E. Doc. 231, Pg ID# 4425-4426]. The Court did not directly address or give weight to the Governors agreement, the Transportation Committee MPO two bridges decision, the allegations of pre-selection of route A-15, or the "Approach to Preparation of the SEIS" document as evidencing pre-commitment to the P&N.

The Court dismissed outright as 'vague and unsubstantiated' Claim 7 that planners were involved in purchasing property in the right of way prior to the ROD. [Final Order, Doc. 231, Pg ID# 4442-4443]. The Court excluded the proffered evidence of *inter alia* the dispute over lawyers contingency fee between Soterion and the Simon Waterman law firm. [Soterion Doc. 154-7, Pg ID# 2673].

The CEQ regulations are binding on the agencies. 40 C.F.R. § 1500.3. Pre-commitment to an alternative by financial investment and executed contracts violates 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1502.2(f) - (g);. "NEPA procedures must insure that environmental information is available to public officials and

citizens before decisions are made and before actions are taken." 40 CFR §

1506.1(a) provides, (a) Until an agency issues a record of decision . . .  no action

concerning the proposal shall be taken which would: (1) Have an adverse

environmental impact; or (2) Limit the choice of reasonable alternatives.

In this case the record shows the alternatives were already decided and

committed to before the first EIS process and again before the second SFEIS

process.

KYTC Secretary Michael Hancock met in secret meetings not included in

the record, with Soterion President Scott Jones before October 2010 to agree on a

price for the Drummanrd Estate, almost a year before the Purpose & Need and

consideration of alternatives was put out for comment in June 2011.

In ¶¶ 99-100 of the Complaint, Claim 7 also alleged the process followed by

the agencies violated 40 C.F.R. 1502.2 (g), "Environmental impact statements

shall serve as the means of assessing the environmental impact of proposed

agency actions, rather than justifying decisions already made." CART raised a

disputed material fact in its pleadings that KYTC's refusal to hand over documents

showing who Secretary Michael Hancock dealt with in selling the Drumanard

Estate to Soterion Corporation covered up self-dealing. [Complaint Doc. 124, ¶¶

49-50, Pg ID# 1131-1132]. The self-dealing was based on insider knowledge of the

selected A-15 route. [Open Records Decision R.E. Doc 136-10, Pg ID# 1426-

1435]. Disputed material facts remained unresolved and summary Judgment was improper on this Claim. Clearly CART sought further information respecting the Soterion deal and discovery should have been permitted.

### 5. Title VI Factors

In dismissing Claim 14, the Court ruled there was no private right of action pursuant to FHA Order 6640.23. In that Order, FHWA commits to implementing Executive Order (EO) 12898, <u>Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations</u>, issued February 11, 1994. CART did not seek jurisdiction under the Order but only that it be used as a measuring standard under NEPA through the APA cause of action to assess the reasonableness of the Appellees NEPA decisions. The disproportionately high and adverse impacts of the project on the low income minorities started with the P&N aimed at inducing East End economic growth but the West End. This exclusion was a product of the pre-NEPA process of the suburban, white KIPDA members.

As early as 1994 transportation planners had been ordered to specifically consider race disproportionate impacts of major transportation projects, but the record is bare that the KIPDA MPO produced any documented consideration. This would be brought up in February 2002 by the Paul Bather Jim Wayne Title VI Complaint. [AR2_0000102956 - AR2_0000102972].   By that time, the agencies were already committed to the two bridges project. The socio-economic factors

included in the FEIS came after the Title VI Complaint starting with a response in March 2002 by the states. See, KYTC - INDOT [Letter to FHWA, KYTC-INDOT AR2_00102559 - AR2_0012565]; [CART exhibit Doc 146-16, Pg ID 1865- 1871].

The Title VI compliance consisted of providing a forum for minorities to comment on an already committed-to project. None of the narrative describes early inclusion of social justice issues in scoping just as it is absent from the JHK and CTS Scoping documents. Social justice factors were not integrated at the earliest stage and post hoc comment response is no relief.

"The touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." California v. Block, 690 F.2d 753, 767 (9th Cir. 1982). The Courts dismissal of Claims 14 and Claim 20 on the basis that post hoc social justice considerations amounted to fair consideration was error.  Providing for public information after decisions are made controverts the fundamental NEPA goals.

### 6.    Claims 3 & 9 Reasonable alternatives analysis

CART Complaint Claims 3 and 9 allege that an overpriced $ 10 billion tolled modified alternative was selected, and reasonable non-tolled alternatives were improperly excluded. [Complaint Doc. 124, Pg ID# 1144-1145; 1148]. CART pointed to the factors that the tolled alternative required setting up and administering a tolling authority bureaucracy costing as much as a new bridge

itself to collect, "$ 10.1 billion through 2058" Complaint, ¶83;  $10 billion over 46

years." ¶ 108.  CART argued the alternatives issue in the Reply to Summary

Judgment. [Doc. 213, Pg. ID# 4016 - 4020](alleging the purpose of the addition of

a second bridge project was to inflate the cost by $ billions).

     The deliberate construction of a two site P&N and its use to eliminate

reasonable alternatives for each local site as stand alone options caused early

elimination of light rail without a fair comparison of environmental impacts

between light rail and constructed highways with combustion engine vehicles.

A two site combination East End Bridge/Light rail, would have reduced

Downtown Bridge VHD by 11.9 % owing to East End Bridge diversion as found in

the Technical Memorandum [One Bridge, AR1_00001137], plus the traffic

reduction removing some 1600 trips due to light rail minimum ridership. The

feeder bus network, proposed for the three-route concept would be much more

extensive in addressing Title VI concerns, using from 54 to 120 additional buses,

more than the selected alternative.   Combustion emissions comparisons were

never made between light rail and a Downtown Bridge though the significance is

obvious.

     The purpose of NEPA is twofold: " 'ensure[ ] that the agency ... will have

available, and will carefully consider, detailed information concerning significant

environmental impacts[, and] guarantee [ ] that the relevant information will be

made available to the larger [public] audience.' <u>Robertson v. Methow Valley</u>

Citizens Council, 490 U.S. at 349.  40 C.F.R. § 1500.1(b).

The Court ruled that NEPA does not control the agency's choice among alternatives but does require the agency to consider and disclose the reasonable alternatives and their evaluation. The selected procedure violated NEPA and eliminated at the screening level reasonable alternatives whose public value was significant. The Court's dismissal of Claims 3 and 9 was an abuse of discretion.

**D.    The SFEIS omitted significant environmental impacts**

CART alleged that significant environmental impacts of the selected alternative that must be included in an EIS were in fact denied or omitted. 42 U.S.C. § 4332(2)(C) obligates agencies to take a " hard look" at " any adverse environmental effects" of the project. The CEQ regulations explain that these include both direct and " indirect effects," which are those that " are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.

**1.    Suppression of Metro greenhouse gas policy**

CART alleged in Claim 16 that Appellees purposefully and in bad faith excluded from the SFEIS a major Metro Louisville government policy decision made as early as 2005 and before the Notice on Intent for an SEIS, to reduce green house gas emissions and adopt light rail transit projects to limit climate change impacts. [2nd Amendment, Doc. 184-3, ¶ 142, Pg ID 3313-3317];[2nd Amendment

Memo, Doc. 184-2, Pg ID 3307-3310]; [2nd Amendment Reply, Doc. 219, Pg ID 4420-4425]("Defendants knew Jefferson County mobile sources were responsible for 5.6 million annual tons of CO2e emissions in Jefferson County in 2006."); [Final Order Doc. 231 Pg. Id. # 4458.]

Both the Court and the Appellees agree that the climate change is 'globally significant' but insist that inclusion of greenhouse gas emissions data in the SFEIS would not 'better inform decisions." [SFEIS AR1_00000751-AR1_0000752] ("While FHWA acknowledges the global significance of climate change, it does not believe it is informative at this point to consider greenhouse gas emissions in an Environmental Impact Statement (EIS)").  [Final Order Doc . 231, Pg ID# 4458].

This omission is arbitrary, capricious and unreasonable in light of the facts including the Metro Louisville government decision to reduce GHG emissions through reducing single occupant vehicle travel. CART proffered three documents the Court refused to consider. First the Trinity GHG Inventory, [ECF Doc. 227-1 Pg. ID #: 4279 - 4281] of Louisville GHG emissions, and the related Transportation Group Report [ECF Doc. 227-2 Pg. ID #: 4338]. CART proffered President Obama's policy statements and the directly relevant CEQ Guidance. [First Amendments, Doc. 227, Pg. Id.# 4227]; [CEQ Guidance, Doc. 219-2, Pg. Id. 4135]. CART showed the EPA consulting agency recommended Appellees use the

CEQ Draft Guidance to provide a GHG assessment.  January 9, 2012, SDEIS

Comments Letter to Janice Osadczuk, U.S.DOT, FHWA from Heinz J. Meuller,

Chief NEPA Program Office. [AR1_00001698]. [2nd Amend Memo, Doc 184-2,

Pg ID#3308].

> The draft guidance explains how Federal agencies should analyze the environmental impacts of greenhouse gas emissions and climate change when they describe the environmental impacts of a proposed action under NEP A. It provides practical tools for agency reporting, including a presumptive threshold of **25,000 metric tons** of carbon dioxide equivalent (CO2e) emissions from the proposed action to trigger a quantitative analysis **. . . we recommend** that the assessment explicitly reference the draft guidance, describe the elements of the draft guidance, and to the relevant extent, provide the assessments suggested by the guidance.

In February 2011, when the SDEIS Purpose & Need and Alternatives re-

comparison were initiated, GHG emissions were a significant changed

circumstance in the opinion of local and federal agencies entitled to deference.

The SFEIS 2030 projected 33,520,000 regional VMT vehicle miles traveled per

day, an increase of 145% over 2012, made GHG emissions significant. [SFEIS

AR1_0000749].  FHWA's offer of policy in place of impacts analysis violates

NEPA which does not permit environmental impacts to be rendered

inconsequential by conceptually segmenting impacts into meaningless 'global'

pieces.  Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1182

(10th Cir. 2002).

The Court relied in error upon North Carolina Alliance for Transp. Reform,

Inc. v. United States Dept. of Transp., 713 F.Supp.2d 491 (M.D.N.C. 2010). That case is clearly distinguished from the one *sub judice*, as first, not including a request by EPA that Appellees comply with the CEQ Draft Guidance.

> "Under NEPA, EPA is the agency charged with determining whether a federal activity will adversely impact the " public health or welfare or environmental quality." 40 C.F.R. 1504.1(b). At no time, however, did EPA suggest the need to study greenhouse gases."

Id at 520. Here EPA made the suggestion. Second, In the North Carolina project, "Plaintiffs also contend that the SFEIS/FEIS projects that the Northern Beltway will increase vehicle miles traveled by 1.8 percent." Id. In the LSIORBP, VMT-Vehicle Miles Traveled are expected to increase 145% by 2030. [RROD, AR1_00000113]. The impacts are not comparable.

Further, the North Carolina Court allowed and considered extra record evidence on the claim proffered by the Plaintiffs. Id. at 515.

The second case relied upon by the Court also allowed in extra record evidence to consider claimed omissions of technical data. Sierra Club v. Federal Highway Admin., 715 F.Supp.2d 721, (S.D.Tex. 2010). That case found: "The plaintiffs have not, however, pointed to any law or regulation showing that defendants' failure to consider greenhouse gas emissions makes the FEIS inadequate, or makes the decision of the FHWA arbitrary or capricious." Id. at 741. CART did point out below law and regulation including EPA's request that Appellees comply with the February 18, 2010, Draft Federal Guidance from CEQ.

[Reply Memo Amend., Doc. 219, Pg. ID# 4120-4121]. Both Metro Government and EPA are on record that the GHG analysis (much of which had already been performed) was helpful in decision making. The President of the United States policy statements concur.

Greenhouse gas emissions impacts are within the technical expertise of the EPA. CEQ is due deference on its interpretations of implementing regulations for NEPA. Metro Louisville's local policy findings are due deference when they announce a low emissions transportation policy. Appellees decision that environmental impacts of GHG would not be meaningful in comparing alternatives denied the public analysis of significant environmental impacts and was arbitrary and capricious. The Court clearly erred when it failed to enforce NEPA mandates by excusing the omission of greenhouse gas use in re-comparing alternatives and providing public information in the SFEIS.

### 2.    Unregulated significant impacts of Ultrafine particulate

One of the most profound bad faith proceedings in this case is the Appellee's exclusion from the EIS of high quality scientific discussion of the impacts of ultrafine particulates. CART proffered substantial evidence of EPA programs identifying the significant impacts of ultrafine particulate emissions that was excluded by the Court. See, [Rochester Study, Doc. 124-7, Pg. ID # 1185]:

"UFP in the nasopharyngeal and tracheobronchial region can translocate along sensory neurons to the CNS and to ganglia of the autonomic nervous

system (ANS) (Oberdörster et al., 2004)."

There is mounting evidence that UFP, once deposited in the lung, "escape" alveolar macrophage surveillance and gain access to the interstitium and the blood circulation (Oberdörster, 2004). There is further evidence that nano-sized particles, after transcytosis into pulmonary capillaries via endo- thelial cells, are taken up by blood platelets, the most numerous white blood cells (Berry et al., 1977). In addition, UFP can be transferred through the circulation to the liver, spleen, and bone marrow.

Complaint Claim 12 in ¶¶ 123-124 and Claim 13 in ¶ 127 allleged violation of NEPA by failure to identify ultrafine particulate emissions from highways as significant effects and present their concentrations impacting low income minorities and others along highway corridors.

The Court erred by failing to recognize or differentiate UFP emissions from coarse (PM 10) or fine (PM 2.5) particulate emissions regulated by NAAQS. The Court did not recognize that NAAQS gravimetric methods do not detect UFP though that in no way reduces the significance of the health impacts. NEPA requires that if an environmental impact is significant it must be given a "hard look" in the EIS. The Court's discussion of irrelevant other compliance with the CAA in the conformity finding misses the point. Here, a significant effect of highway emissions is known to Appellees, methods of detection are known to them but the matter was excluded from the EIS in violation of 42 U.S.C. § 4332(2)(B) & (C). NEPA imposes a duty on the Appellees to report the facts.  UFP is not a subset of particulates detected and regulated by the current NAAQS. Conformity based on

tonnage of pollutants does not include any data of UFP particulate counts or concentrations. Appellees know UFP have serious public health implications and are in high concentrations on its project corridors. There is zero controversy in the peer reviewed literature about the significance of UFP or that it is emitted in high volumes from vehicles--regulation is coming. NEPA' s basic purpose was foiled by the Court's dismissal of Claims 12 & 13 where it excused the agencie's "failure to conduct a thorough investigation of this matter." [Order, Doc. 231, Pg. ID# 4457]. This was clearly erroneous and exclusion of proffered evidence abused discretion.

### 3.     Chloride and conductivity

CART Claims 10 & 11 charge violations of the water quality standards and impacts the warm water aquatic ecology will occur as a result of road runoff not contained or controlled by 10,000 gallon detention tanks used in the project. Under NEPA these significant effects should have been presented in detail for alternatives comparison but were not. [Complaint Doc. 124, Pg ID# 1149-1151]. CART charged the SFEIS contains no data about direct, indirect and cumulative impacts of reasonably foreseeable concentrations in stormwater collected from the hundreds of acres of paved roadway and discharged through storm outlets to receiving waters. The high quality information was necessary for alternatives comparison. 40 C.F.R. 1502.22(b). [ SJ Resp. Doc. 213, 4023- 4028].

CART proffered exhibits to show the agency had not considered important

factors related to chloride ions causing conductivity spikes in Harrods Creek from road deicing runoff. The agencies evaded a "hard look" at road runoff pollutants and the conductivity graphs showed what they omitted.

> "Chloride, and to a large degree sodium, the two primary ions in road salt, remain in solution, making it difficult with present-day technology to design effective management practices for reduction of road-salt loadings to receiving waters after application."

[Road Salt, Doc. 154-19, Pg Id # 2769];[ Conductivity, Doc. 228-5, Pg. Id. # 4377 - 4387]. CART argued the agencies in deliberate bad faith excluded the water quality impacts of deicing salts, the quantity to be applied, the discharge outlets and reasonably foreseen concentrations resulting in water quality violations due to the <u>false</u> 'best management practices' alleged 'controls.'

CART cited to the agencies own letters that the chloride was not removed and would directly discharge in high concentrations to receiving waters:

> *"While salts from roadway de-icing are not removable with the treatment vault, the salts would, instead of draining into the well-head protection area, be diluted by storm discharge, emptied directly into Harrods Creek, being diluted and flowing into the Ohio River. . ."*

Feb. 8, 2011, letter, John Stacksteder, P.E. Project Manager Community Transportation Solutions.

However the Harrods Creek is contained within the wellhead protection area and no details of the impact of the dilution of concentrated road runoff was provided.

CART proffered extra record demonstrations by the USGS that winter deicing road runoff had significant effects currently causing violations of water quality laws to

receiving waters of the project. See, [USGS Graphs, Doc. 228-5, Pg. ID. 4377-4385]. This is not a dispute about detection methods within agency discretion but omission of significant impacts from the SFEIS in violation of NEPA. Presenting other vague and unrelated data of water quality impacts does not excuse the duty to present specific information on significant impacts of deicing chlorides, a major adverse national water quality effect directly caused by road maintenance. See [Road Salt, Doc 154-19, Pg ID # 2763 - 2769]("Greater aquatic toxicity and water-quality impacts seem likely if increasing trends in road-salt usage and expanding urban development continue."). See also 2-12-2002 Letter from Timothy Kuryla , KY Division Of Water [Doc. 125, Pg ID# 1190]("Road spill and ordinary drainage will reach the wellhead protection area.");

### 4.    Delay of Permitting, Tunnel Spoil disposal, Piers in the Creek

CART Claims 8, 18 and 19 further alleged improper NEPA procedural violations by deliberate delay and exclusion of significant environmental impacts from presentation in the SFEIS. Claim 8 made in September 2012, ¶ 103, alleged that some 350,000 tons of excavated tunnel spoil would be removed and hauled to undisclosed sites including floodplains  and wetlands. ¶ 104 alleged this was a significant environmental impact not presented in the SFEIS. Claims 18 and 19 were made ten months later in the 2nd Amended Complaint in July 2013 after a search of the record and Section 401 Water Quality applications by the states

revealed new facts.  [2nd Amend. Doc. 228, Claim 18, Pg ID# 4365-4367, ¶ 150, Deliberate delay in filing for Section 401 water quality certification; ¶ 151 delay to thwart effective public consultation; ¶ 152, excluded the location of tunnel spoil fill deposits in the floodplain and WHPA; ¶ 153, excluded details of 60 inch pipes direct discharge of deicing pollutants to Harrods Creek; ¶ 154, excluded deicing conductivity from EIS and failed to consult USGS on current stream monitoring; ¶ 155, excluded details of roadway stormwater infrastructure from alternatives consideration;  ¶ 156, All in violation of 42 USC § 4332(2)(C) and 40 C.F.R. § 1502.24.  Claim 19, ¶ 158, excluded 401 water quality application map showed massive piers installed in main channel of Harrods Creek; ¶ 159 woody debris will clog channel and destroy aesthetics; ¶ 160, reasonable alternatives not presented keeping piers out of the creek.  CART proffered omitted evidence not considered by the Court. [Section 401 App. Doc. 228-1, Pg. ID # 4370- 4373];[Bridge Piers Doc. 228-6, Pg. ID # 4388]. CART alleged this violated NEPA and CEQ requirements for concurrent agency review. CART's argument was that all during the NEPA process the Appellees knew exactly where a large tonnage of spoil would be placed --in the WHPA across Harrods Creek in a massive six lane wide forty foot high road embankment on top the uncontained alluvial aquifer. They deliberately withheld this aspect of the A-15 route to avoid having to present hauling hundreds of tons of spoil across a temporary creek crossing.

The Court found the Appellees 'acknowledged' the environmental impact of tunnel spoil and that sites would be investigated further and as such NEPA was not violated. [Final Order Doc. 231, Pg. ID# 4443]  The Court made no discussion of the significance of the Memo cited in Claim 18, ¶ 149, 'Draft Approach to Preparation of the SEIS' (AR2_00051755-00051761) where a deliberate strategy was announced to delay past the RROD the full disclosure of impacts in the Section 401 WQ application. The Court failed to enforce NEPA and require presentation of significant environmental impacts. This defeated the CEQ regulations requiring concurrent agency review where Appellees had already determined major spoil sites during the NEPA process.  40 C.F.R. 1500.1(b).

## TITLE VI

**E.    The Court erred in dismissing the Title VI Claims**

Complaint Claims 3, 9, 14, 15 & 17 alleged sufficient facts to meet the Appellants burden to establish a prima facie showing of discrimination. [Complaint R.E. Doc. 231, Pg Id # 1142 -1154 and facts Pg. Id# 1132, 1141-42] [First Amended Complaint R.E. Doc. 184-3, Pg Id # 3317-3318] See also,  [CART Memo Title VI, R.E. Doc. 179-1, Pg Id# 3230].  Intentional discrimination may be shown in a Title VI claim by alleging facts and circumstances under the four factor test established by Arlington Heights v. Metro. Hous. Dev.Corp., 429 U.S. 252,

266, 97 S.Ct. 555, 564, (1977). "[T]o avoid summary judgment on a claim under 42 U.S.C. § 2000d, a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race." Buchanan v. City of Bolivar, Tenn., 99 F.3d 1352, 1356 (6th Cir.1996). A motion to dismiss will be denied only where the " [f]actual allegations [are] enough to raise a right for relief above the speculative level" " on the assumption that all of the complaint's allegations are true...." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

The District Court excluded extra-record evidence, denied further discovery, and considered the adequacy of each separate Claim to support an inference of intentional discrimination, before dismissing them. CART argues the Claims should have been considered cumulatively with their supporting alleged facts and proffered exhibits in support of its burden to make a prima facie case of intentional discrimination sufficient to survive summary dismissal. CARTs strongest exposition of supporting facts was set out in the Title VI Reply Memorandum [Title VI Reply KY-IN,  R.E. Doc. # 230, Pg ID # 4400-4411].

The Court initially found sufficient organizational Article III standing to move forward to substantial review. [Order R.E. Doc. 231 at 4464 (citing Mattie Jones affidavit Doc, 214-1, pg ID#  4042)]. See also, [Coyte Affidavit, R.E. Doc. 178-2 pg ID # 3175].

Despite each of the Title VI Claims being preceded by a paragraph incorporating by reference the entire prior Complaint averments ¶¶ 1-73, and statements of law, the Court in error nevertheless analyzed each claim separately and required each to state a complete Title VI allegation. FRP 10(c).

42 U.S.C.A. § 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Buchanan v. City of Bolivar, Tenn., 99 F.3d at 1356. The Court applied the dicta from Buchanan, "where the decisionmaker is motivated by a factor other than the excluded party's race, there can be no intentional discrimination." Citing, Hazen Paper Co. v. Biggins, 507 U.S. 604, 609, 113 S.Ct. 1701, 1705-06, (1993).

Hazen, a case construing an age discrimination claim under the ADEA, would dismiss the ADEA claim where the agency is "wholly motivated" by a factor other than race. Thus the Court dismissed claims because the agency stated another non-discriminatory purpose for its choices, and the Court inferred the agency was thus 'wholly motivated' by non-discriminatory purpose.

Here, the Court failed to apply the appropriate test. CART need not prove that Appellee's action "rested solely on ... discriminatory purposes," for "[r]arely can it be said that a legislature or administrative body operating under a broad

mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." Arlington Heights, 429 U.S. at 265, 97 S.Ct. at 563; see also United States v. City of Parma, Ohio, 661 F.2d 562, 575 (6th Cir.1981), cert. denied, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982) ("There is no requirement that ... intent be the sole basis of official action, if it is a motivating factor.").

The Complaint and pleadings read together evidenced a pattern of significant impacts falling disproportionately upon the low income minorities of the West End of Louisville sufficient to survive summary dismissal. The excluded extra-record exhibits should have been consulted in the first instance to weigh the Appellants prima facie case of intentional discrimination under the Arlington Heights burden shifting analysis. Arlington Heights, 429 U.S. at 266-68. ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.") See, [Order R.E. Doc. 231 at 4469, fn 37] (adopting the burden shifting standard).

**1.    Whether the project bears more heavily on one race than another**

The Supreme Court states that the, " important starting point for assessing discriminatory intent under Arlington Heights is the impact of the official action

whether it bears more heavily on one race than another." Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 489, 117 S.Ct. 1491, 137 L.Ed.2d 730 (U.S.1997).

Complaint Claims 3, 9, 14, 15 & 17 when read together with the supporting pleadings motions and memoranda show the project bears more heavily on the black minority West End population as first alleged in the Title VI Complaint filed in February 2002. [Bather Wayne Title VI, AR2_00102954 - 00102972]; [Complaint R.E. Doc. # 124, Pg ID # 1129-1142].

The record shows the original scoping documents leading to the JHK recommendation for a two bridges alternative, adopted into the TIP by MPO KIPDA in 1998, presumed great economic growth would be induced by serving east Jefferson County and Southern Clark County with a new bridge crossing.

That economic growth would benefit the predominantly white suburban areas of Metro Louisville. Induced economic growth to the white, east county was no more than a continuation of the historic post WWII 'white flight' from the urban core to the outer ring that has produced 'structural racism' in Metro Louisville. [Health Equity, R.E. Doc. 126-6, Pg. Id. 1175].

The Court faulted the bare bones Complaint claims for failing to include a discussion of whether the Court must defer to the demographic data gathering method of the agency under Title VI claims. Madison-Hughes v. Shalala, 80 F.3d 1121, 1124 (6th Cir. 1996). NEPA requires a "hard look" at the socio-economic

impacts of projects and read together with Title VI mandates a rigorous collection of socio-economic data that is within the scope of project impacts. 40 C.F.R. § 1502.16. The issue is the extent of the data presented and its absence in scoping and alternatives comparison--not the method of collection. The agency may not select a method that fails to sufficiently characterize the socio-economic impact or entirely omit relevant data of the distribution of induced economic growth benefits. [Order R.E. Doc. 231 at 4465]. But assuming *arguendo*, it wasn't deficient, it was still not present in the scoping and alternatives consideration.

## 2.    Historical background of invidious purpose

A material factor in the Arlington Heights test is the history of the decision, "particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. 267.  While urban core blacks contended with shuttered businesses, rising unemployment and a failing bus system in the 90s, KIPDA's predominantly Caucasian planners were insensitive to the same problems and included nothing of it in their early planning. [JHK ORMIS Study, R.E. AR2_00125686] (recommending two bridge solution); August 1999 [CTS Scoping Study, R.E. AR2_00123696]("if the Indiana Ammunition Plant is to be developed, transportation access must be improved."). These documents are bare of any reference to Title VI data or factors.

On February 25, 2002, members of the Kentucky General Assembly, Jim

Wayne and Paul Bather, filed a Title VI Complaint: Re: Failure to Comply with

Title VI in EIS for the Louisville Bridges Project [Bather Wayne Title VI,

AR2_00102954 - 00102972]; [Complaint ECF Doc. # 124, Pg ID # 1129-1142]. It

stated, *inter alia,* "when the socioeconomic reports developed to support the DEIS

conclusions are evaluated, it is obvious that the needs of Louisville's minority and

low income populations have actually been consistently ignored." They referenced

a report, Savitch & Vogel, Ohio River Bridges Project: Sprawl and Urban

Disinvestment, [AR1_00014922- AR1_00014956]   "Suburbs would continue to

sprawl, business would continue to gravitate toward new malls on open land, and

disadvantaged populations would continue to segregate the central city. Those

disadvantaged groups would have least access to job opportunities." [CART

Complaint ECF Doc. # 124, Pg ID # 1132 - 1133; 1141- 1142]. This prediction has

played out exactly as forecast in the ensuing ten years. [Bather Wayne Title VI

Complaint, AR2_102954; AR2_102956- AR2_102972].

The largest transportation project in Kentucky history has been planned with

longterm high, adverse disproportionate impacts in tolling costs to the protected

population. [RROD R.E. AR1_0000024].  Yet the massive expenditure is not

expected to increase urban core employment. The record demonstrates that the

Defendants knew and intended what the consequence of their actions would be:

"In summary, most EJ areas, including the urban core and West Louisville,
are not expected to experience any significant change in employment or

household growth rates under any of the "build" alternatives, as compared to the No Action Alternative."

Environmental Justice Technical Report Addendum INDOT DES. No. 9803640

KYTC State Item No. 5- 118.00. [AR2 _00093658].

### 3.     Evidence in the decision making sequence

"The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." Arlington,  429 U.S. 267

Project planners decisions eclipsed and ultimately defunded the competing T2 Transportation Tomorrow light rail project that its backers had expended $ 9 million developing. While appearing to consider light rail alternatives in the LSIORBP, the Appellees excluded Title VI factors from the analysis and ultimately screened it out as not meeting P&N. The three route light rail system screened out at the conceptual level included an expanded feeder bus system that was much more comprehensive than the present enhanced bus mitigation proposed in the RROD. This was a major set back for Title VI mobility.

CART alleged the facts of entrenched 'structural racism' in its Title VI Reply Brief to KYTC and INDOT. [Title VI Reply KY-IN, R.E. Doc 230, Pg. Id. 4393-4396](citing busing desegregation cases, McFarland v. Jefferson County Public Schools, 330 F.Supp. 2d 834 (W.D. Ky.2004).

CART's Complaint ¶ 133(b) alleged that after being given a Title VI complaint, the Defendants acted with deliberate indifference to the discriminatory

impact of the LSIORBP and formulated a mega project that drained available federal funding from the T2 light rail project, causing a loss of $ 9 million already expended for the EIS and killing the affordable light rail transit project that had particular benefits for the protected class. At trial and through discovery, CART would show this to be supported by the evidence. "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." Arlington, 429 U.S. 267. The unusual scrubbing of the T2 project that promised to assist the Title VI population had longterm adverse impacts to Louisville's poor minorities.

### 4.    Administrative history

CART alleged in ¶ 133(c) that Defendants obscured the socio-economic conditions of the Title VI area to avoid addressing transportation needs so as to maintain the disadvantages imposed on the minority population because the crime ridden area is a useful pool of minority disproportionate arrestees to churn through the criminal justice system. CART proffered extra record evidence of LMPD budgets and other evidence of race disproportionate arrests. CART cited the Metro Health Equity Report as a factual support that transportation planning informed by current socio-economic conditions is desperately needed. CART proffered the Affidavit of economist Peter Meyer in support of the data showing Title VI minorities were dependent on public transit. [Meyer Affidavit, 178-3, Pg, ID#

3213- 3219](population of households without cars is over 20% in the central city area of the LMA). [Title VI Reply KY-IN, R.E. Doc 230, Pg. Id. 4394](Title VI area lowered life expectancy, highest unemployment, highest foreclosures, low vehicle ownership, highest crime rates).

CART alleged Complaint ¶ 133(d) alleges the Defendants intentionally discriminated on the basis of race by adopting an unreasonable tolling plan that would disproportionately burden poor minorities for 46 years or more. The Amended Complaint Claim 17 alleged,  "Elimination of tolling would eliminate disparate impacts through 2058. It would eliminate costly and chaotic mitigation and enforcement of toll impacts and the need to collect some $ 8 billion in toll revenues to operate tolling infrastructure and pay bank financing. Tolling infrastructure and administration alone is anticipated to cost $ 1.3 billion." [First Amended Complaint R.E. Doc. 184-3, ¶ 146, Pg Id # 3318].

Complaint ¶ 133(e) alleges that the purported mitigations of rehabilitating the Trolley Barn in the West End wasted $ 20 million of Transportation Enhancement funds on a construction project that did not improve personal mobility for the Title VI residents. The Trolley Barn usefulness as a maintenance shed for a revived trolley system was destroyed and no African American Heritage museum as first proposed was ever installed. See, [Title VI Memo, Doc. 179-1 Pg.

Id. 3233 - 3238]. However the money appeared to have quieted the Title VI

Complaint filed in 2002.

The Supreme Court states that the, " important starting point for assessing

discriminatory intent under Arlington Heights is the impact of the official action

whether it bears more heavily on one race than another." Reno v. Bossier Parish

Sch. Bd., 520 U.S. at 489. The black minority race in West Louisville will bear the

brunt of the NEPA violations in the LSIORBP decision. The mobility lifeline that

could have brought major relief from decades (centuries) of oppression was

snatched away in order to reduce vehicle hours of delay for single occupant

vehicles and create a financial debt with unequal impacts.

> "The assessment of potential long-term economic effects was based on a
> detailed and comprehensive analysis which is available for inspection as part
> of the Socioeconomic Baseline Report at the local project office. The results
> of that analysis demonstrated that construction of any of the "build"
> alternatives—whether a downtown bridge, an eastern bridge, or both--would
> not have a substantial effect on the economic vitality of the urban core or
> West Louisville, which contains the largest concentration of minority and
> low income individuals in the LMA."

Environmental Justice Technical Report Addendum INDOT DES. No. 9803640

KYTC State Item No. 5- 118.00. [AR2_00093664]. To say that these results that

perpetuate 'structural racism' and perpetuate slavery's legacy of social and

economic disadvantage demonstrate no racist intent on the part of the powerful

planners and economic decision makers in the LSIORBP is too ignore the racist

history.

CART Plaintiffs argue they have met the prima facie burden. The facts are not mere legal conclusions and raise a right for relief above the speculative level" " on the assumption that all of the complaint's allegations are true...." Bell Atlantic Corp. v. Twombly, 550 U.S. at 545.

## VIII. CONCLUSION

Though as a matter of legislative policy, CART favors regional mass transportation solutions that implement low emissions fixed rail routes affordable by low income people, the issues presented in this action are grounded in NEPA and Title VI statutory authority and are enforceable by judicial order.

### NEPA/APA

CART Appellants pray the Court to find the Appellees violated NEPA's procedural mandates as alleged in the Claims and that the case be remanded to District Court with an Order instructing that the Court shall:

1. vacate the 2012 RROD,

2. enjoin further construction of both projects pending,

3. development of a Supplemental EIS for each site separately,

4. the Supplementals shall use the CEQ Guidance and Metro GHG Policy to report Greenhouse gas emissions and use the data in comparing alternatives including light rail routes for Downtown.

5. the Supplementals shall provide modeled UFP data and particle number concentrations of various alternatives including light rail and use MOVES latest iteration for modeling air impacts,

6.      the Supplementals shall give detailed consideration of deicing runoff and updated water quality information including modeled reasonably foreseeable concentrations at discharge outlets,

7.      the Supplementals shall present the longterm debt obligations of financing plans and compare non-tolled alternatives of building and financing a single project first before starting the next.

8.      the Supplementals shall integrate Title VI factors into the projects with a detailed discussion of present poverty, employment opportunities and numbers,  mobility needs and community transportation demographics and use the data in comparing various alternatives, including light rail Downtown.

**Title VI**

CART Appellants argue they have met the prima facie burden to survive summary dismissal on the Title VI claims. They pray for relief that the case be remanded to District Court with an Order that CART should be granted its Motion for to obtain discovery, to be permitted to amend the Complaint, and for trial de novo of the Title VI claims.

CART prays the Court grant any other relief legal or equitable to which its entitled,

CART prays for an award of its reasonable costs and attorneys fees in the action.

/s/ Clarence H. Hixson
Attorney for CART

71

## IX.    ADDENDUM

1.    <u>CART Plaintiff Complaint</u>, September 4, 2012, [R.E. Doc. 124, Pg. ID.#: 1113- 1158].

2.    <u>Order and Memorandum</u> of Hon. Judge John Heyburn, Federal District Court, Western District of Kentucky at Louisville, in case No. 3:10-cv-00007-JGH-DW. [Final Order, R.E.. Doc. 231, Pg. ID#:  4418-4476].

3.    <u>Notice of Appeal</u>, [R.E. Doc. 232, Pg. ID#: 4477- 4482.]

4.    CART's First Amendments to the Complaint
[First Amended Complaint R.E. Doc. 184-3, Pg Id # 3313-3318].

5.    CART's Memorandum in Support First Amendments to the Complaint
[First Amended Memo R.E. Doc. 184-2, Pg Id # 3305-3312].

6.    CART's Second Amendments to the Complaint
[Second Amended Complaint R.E. Doc. 228, Pg Id # 4364-4369].

7.    CART's Memorandum in Support Second Amendments to the Complaint
[Second Amended Complaint R.E. Doc. 197-1, Pg Id # 3723-3724].

8.    CART's Motion for Trial de Novo [Motion Trial Doc. 179 Pg. ID# ]

9.    CART's Title VI Memorandum, [R.E. Doc179-1 Pg ID #: 3228-3246].

10.    CART's Response/Reply to FHWA Summary Judgment
[Response/Reply to FHWA  R.E. Doc. 218, Pg Id # 4095-4116].

11.    CART's Response/KYTC INDOT Summary Judgment
[Response/Reply KY-IN R.E. Doc. 213, Pg Id # 3987-4036].

12.    February 2002, Title VI Complaint
[Bather Wayne Title VI, AR2_00102954 - 00102972]

13.    <u>P&N White Paper</u>  June 2011, [AR1_00001070-1079].

14.    <u>SFEIS Alternatives Evaluation Document</u> October 17, 2011,

[AR1_00001086 -1119].

15.  Plaintiff Combined Reply to Opposition to Amend,
     [ECF Doc. 219 Pg. ID #: 4118-4337].

16.  Report of the Transportation Group, [ECF Doc. 227-2 Pg. ID #: 4338-4363].

17.  Trinity Consultants: Greenhouse Gas Emissions Inventory Report,
18   Louisville/Jefferson County Metro Government, November 2008,
     [ECF Doc. 227-1 Pg. ID #: 4230-4337].

19.  JHK Technical Memorandum [JHK ORMIS Study, R.E. AR2_00125686]

20.  Community Transportation Solutions Scoping Study
     [CTS Scoping Study, R.E. AR2_00123696]

21.  DEIS Alternatives Section [DEIS Alternatives, AR1_00012490].

22.  Approach to Preparation of SEIS, [R.E. AR2 00051756 - AR2 00051757]

23.  CEQ Draft NEPA Guidance on Considering the Effects of Climate Change
     and Greenhouse Gas Emissions. [R.E. SDEIS, AR1_00005631

24.  Louisville Metro Health Equity Report: The Social Determinants of Health
     in Louisville Neighborhoods
     [Health Equity, R.E. Doc. 124-6, Pg Id #  1172-1182]

25.  Affidavit of David Coyte
     [R.E. Doc. 178-2, Pg ID # 3175-3187]

26.  Affidavit of Mattie Jones
     [R.E. Doc. 214-1, Pg ID # 4042]

27.  Rochester Ultra-fine particulate study
     [R.E. Doc. 124-7, Pg ID # 1183-1188]

28.  CDM February 2012 Traffic Forecast
     [AR1_00004560- AR1_00005140]

29.  Affidavit of Peter Meyer

[R.E. Doc. 178-3, Pg ID # 3188-3221]

30.    Affidavit Terrell Holder
       [R.E. Doc. 154-2]


## X.    CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. Pro. 32(a)(7)(C), the undersigned counsel of record
for Plaintiff-Appellant CART certifies that:

1) according to the word processing program used to prepare the brief, this
brief contains 13,960 words, excluding exemptions under Fed. R. App.
Pro. 32(a)(7)(B)(iii); and

2) this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2007 in 14 point font in the Times New Roman type
style.

/s/ Clarence H. Hixson
Attorney for CART
Dated:  November 7, 2013

## XI.    CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2013, the foregoing Principal Brief
was electronically filed with the Clerk of Court using the CM/ECF system, which
will send notification of such filing to all counsel of record.

/s/ Clarence H. Hixson
Attorney for CART
Dated:  November 7, 2013
